All rise. Please be seated. Next case on this morning's docket is the case of in Ray, the marriage of Kathy Phillips versus William Phillips. We have Mr Robert. Well, for the athlete. Hey, please. My name is Robert Wells. I represent Bill Phillips. We're here today on the basis of a petition to terminate maintenance brought by Bill Phillips on the basis of continuing conjugal residential cohabitation. The standard in neck in this case is the totality of the evidence, which is one of the reasons why I spent almost 25 pages of my brief trying to outline the evidence. It's there. I also tried to be meticulous in giving you the actual statements and some of the vernacular of the testimony. You will see in that statement of facts that there are times in which I've repeated things over and over because they're set in a different framework and they're important to look in a different light. Admissions are a critical part of what's going on in this case. Admissions take two fold, two forms. In this case, the first form is the fact that the request for admissions and whether or not the answers were properly filed or timely filed. That's an issue. It's in the brief. I'll stand on that. One of the things I think is just as important is what, in fact, was admitted once the answers were filed. And again, that's in the appendix to the brief. Those are admissions that were made in this case and made to Bill Phillips and to myself in order for us to know we need to present a trial. Some of those admissions did not make it into the court order, even though we put into the record as an exhibit the request for admissions, even though they already were on the record. We put them in the record as part of the exhibits in this case. And I ask the court to look closely at that because one of the key issues in this case is the order that was entered. The order that is entered is necessary to review in order to determine what the trial court did, what the trial court considered relevant, what the trial court did not consider to be relevant or worthy to be put into a 12-page order. This is a 12-page order. There are a number of factors that are not included in that order. I suggest that you might want to look at the reply brief on pages 12 and 13 with reference to those things which were omitted from the order, things which were relevant to the determination in this case, some of which were part of the admissions that were put in there and were never contested. And by reason of being in the admissions, they were not part of the testimony. But that doesn't mean they're not part of what the court needs to consider with reference to what is taking place. Consistency is necessary in the order. Also, this court now has the benefit of an order in remarriage of Miller. In remarriage of Miller, the most recent case on the subject matter, we go back to Saffington and we look at Saffington and we go through a summary of some of the factors that are important with references. And it's very noteworthy that some of the factors that Miller uses to reverse the case in that case, because they weren't present, are present in this case, showing that there are certain elements that are changing the lifestyle of the individual that's there. The order should not be dismissive of relevant evidence. It should not ignore relevant evidence. It should not omit relevant evidence. And when it does, this court, particularly in the totality of the evidence standard, has an opportunity and an obligation, in my respectful opinion, is that, your opinion is respectful, I'm asking you to give due respect, is that you want to take into consideration all the elements that are necessary for this. And one of the factors that there is, it's a de novo review with reference to the law and the application of the law. It's a de novo review with reference to the sterile record in this case. And what is the sterile record in this case? The part that is almost dismissive by the trial court. And that is that Naney, the other individual with whom Cathy is accused of resigning with, files with the Secretary of State that 805 Mahala Drive is his residence. It's on his driver's license. It's been his driver's license for at least two years that we know of. He uses it for a voting right. And he files, and it's in the back of the brief, in the appendix, the actual affidavit he signed saying that 805 Mahala Drive was his address. Now, what does the trial court do with that? The trial court has Cathy's hearsay explanation as to why Mr. Naney used the address of 805 Mahala Drive. The reason given was, and if you look at the record, the record you'll find is where it talks about on page, when the mail was received, it starts out by we. It doesn't say he, it says we. It says on page 196 of the record. Why did he do that? It says because he rents this apartment, and then when he leaves to go to Florida, he takes everything out of it. And so we needed to have a stable, dash, dash, dash. He needed to have a stable address. So we have a situation in which the address is given as for a stable address. You don't need a stable address to misrepresent where you're going to vote. Now, we don't say Mr. Naney misrepresented anything. We say he stayed on the road. This is where he lived. We have nothing to say that he didn't live there. We believe he lived there. We're saying he lived there. He said he lived there. He voted from there. In the request for admissions, it says I did the majority of my activities, ate the majority of my meals, did the majority of my laundry at 805 Mahala Drive. Okay. The request for admissions were signed by the party, though not Mr. Neyman. That is correct. Okay. So he didn't say he didn't say that in the request for admissions. She said that. She said, she said, I live at this address. This is what he did at my address, and I'll admit that he did that. What he signed, what he signed on the road was that he was affirming for voting purposes and for his driver's license that this was his address. Now, it's interesting. He also allegedly picked up his mail five days a week. It was there. Yet we have Kathy says, oh, she didn't know that it was received for anything other than junk mail. Now, here's what we do know. We do know that he got his else membership information there, which is a social club. We long to tell the else he lives there. We do know that the mailman gives him the mail because he's familiar enough with him to know that he's there. We do know that when our process servers serve the petition in this case and what we also did, which was a notice for preservation electronic data, Mr. Nagle was served as well at this place. We also know that my client, when he went by there, the golf, he'd see his car there every time he went by. Now, that's true. He only saw maybe three or four times a summer. That's what he saw. But it was there. And what he saw, he observed. We had the majority of the meals being eaten there. Now, another thing that's critical and isn't mentioned in the order is this name and Kathy drive a thousand miles to Florida. They go to Ruskin, Florida. Kathy had no relationship whatsoever. Ruskin, Florida. Until they came. She had no relationship tomorrow. County. You're a woman. Don't name the camera. So we have an entire change in a lifestyle, a change in living address, a change in where she lived. All that's taking place. Significant. We also have a change with reference to the relationship with her family. Kathy, at one point in time, had her grandchild living with her. The grandchild of both Bill and Kathy would live with Kathy. But for the move, the Montero County in Waterloo to an address that was found by Mr. Namie. Kathy saw Kobe, her grandson, every week. But these are adult children. No, he's not an adult. He's not an adult child. It's a grandchild. The adult children visited more very infrequent. The daughter made three times over three years. This is Kobe. I thought he was also an adult. No, he is not. Do you know how? I'm going to say he was 16 at this time. Who do you look? Who is he spending his weekends with? With my client Bill. He spent every weekend with Bill. Bill said that every weekend was spent with Bill. So we had change as well. Most telling is this. Between the first hearing, which was in March, and the second hearing in April, we had the fact that, what does Kathy do? She decides she's going to move back to Belleville. Why is she going to move back to Belleville? She's going to move back to Belleville to find new relationships, to reestablish her relationship with her grandchildren. She does that at that time. Because at that time, she says, I want something different. Now, what was the thing that she went to Monroe County and Waterloo for? She went to Monroe County and Waterloo to a place that was found by Mr. Newman. Their relationship started before she moved to Waterloo. Now, in this, we have another issue, and that is, is there an obligation to go forward with proof? We've never claimed that the burden of proof shifts. We have the burden of proof. We don't deny that. But just as the Supreme Court said in Sappington, the obligation to go forward with the evidence shifts to the party who is the recipient, once we have evidence to the effect that there is a relationship that's going on. In this case, we had the request for admissions, the majority of the events, activities, vacations, travel, is all taking place with Mr. Newman. We have the recreation activities as well. We also have, during this period of time, we have that Mr. Newman is saying, this is my address. There was an order that was entered back in January of 2015 in which Kathy is told, if you have the name of any person who can refute the fact that there is a relationship going on, you have an obligation to provide that person and that name and address of that person. The only person whose name is provided in discovery for this purpose is Kathy's sister, is not called. We don't have any neighbor who's mentioned, anybody who's on site. Also mentioned in the Whisper case is the fact that in these cases, this information is in the control of the recipient's spouse. In Kathy's case, it's even more in her control because unlike some situations where you're in the same community, the same neighborhood, we have her removed from the neighborhood in which that observation can be taking place. As a matter of fact, in the Miller case, maybe they make that very point, that one of the elements that is considered sometimes is whether or not the new relationship has taken away the opportunity to observe and the concealment of the relationship from the other spouse and from the community at large as far as what's going on. In the Miller case, there's another element that's also furried over, and that is the Miller, the other person, was not given a key. Mr. Naaman has a key. He's got a key to place on Mahalo Drive. It's admitted in their request for admissions. It's not challenged, but it's not mentioned in the order. We have that there as well. We have that in Florida. We have the fact that they go to Florida for six months. If you read the request for admissions, it says, we vacationed in Florida the winter of, and there are two years in which that takes place. We vacationed together. Now, there's a statement made that, oh, I rented out my place for three months. Okay, you're there for six months. Well, maybe it was the summertime. No, the question's specific. It's to the wintertime. So there are three months of the wintertime in which Kathy's place is rented out. Yet Kathy has no explanation and presents no explanation as to where she lived. Was she asked? Was she asked that question? No, she was not. By anyone. That's my point. No, but quite frankly, Justice Stewart, that was a point made by the trial court. In the trial court, in the transcript, if you look at the transcript and you go back to the renegade trailer, you'll get to find where Kathy stayed. I'm sorry, my pages are kind of chopped off at the end. In there, it's specific. There's a discussion with the court as to whether the question was asked. The best we can say about that is there's no evidence of where she stayed. There's no, exactly right. But I would respectfully submit to the court that the burden of going forward with the evidence, once there is an inconsistency and a discrepancy in a person's testimony, it's the person who presents that testimony. It's not my obligation to go forward and get that explanation. If you're saying I have some other reason why I live someplace else. Now, we know when the family members were down there, she stayed with Mr. Naiman. Because that's testified in the evidence. We do know that Mr. Naiman also rented out his trailer. Now, he used to. We're not told exactly how long and when it ended and started, but he used to rent out his trailer, too. Now, why did they rent their trailers out? They rent their trailers out to pay for their space that's down there. It's understandable. But there's also logical that they also spent time together, not only living together during the day, but during the evening as well. But I submit to the court under the Heron case, I'm not required to make that proof. And I think there's a very telling comment that's made in the Miller case that hits this right on point. And that is, it's the day-to-day existence, not the overnight living, that's the most important. Thank you. Thank you. You'll have the opportunity for rebuttal, Mr. Wells. Thank you, Your Honor. Mr. Tibbs. May it please the Court, I'm Rhonda Fiss and I represent Kathy Phillips. Your Honor, I'm quite frankly a little confused about the representation that the burden of proof somehow shifted in this case at some point. I'm not sure where that point would occur, and I'm not sure what the authority is for the representation that it does shift. Well, I think he's making a distinction between shifting and the burden of going forward. Going forward with evidence? Yes. Okay. I suppose then it should be noted that the question that was asked of Kathy Phillips was posed by Mr. Wells as to how long she rented her trailer. And during that exchange on cross-examination with Mr. Wells, it was not asked, it was not elicited as to what the other three months, what the situation was. In fact, the judge came back and posed a question to Ms. Phillips that apparently she gave a satisfactory answer to. Mr. Wells did not then follow up on it. But one thing I want to make clear, Kathy Phillips and Don Nauman have consistently maintained separate residences, both in Illinois and in Florida. They mingled nothing, no material assets. They mingled no income at any point in this, quote, relationship. Admittedly, Kathy says the relationship started as a dating type of relationship, but quickly changed into some type of friendly companionship. They never lived together. There is absolutely, as the court pointed, trial court pointed out, there is absolutely no evidence of cohabitation. First threshold not met. It was never clear, although as Mr. Wells pointed out, he knew from the discovery that we had provided that there were neighbors who may have information, there were relatives, he's talking about Kobe, the grandson, the son and daughter, who all had information pertaining to the living situation. None of those were called by the person who had the burden of proof in establishing that a continuous conjugal relationship existed. In analyzing whether a conjugal relationship exists, the courts, including the Illinois Supreme Court, have examined relationships that have taken as long as 12 to 15 years, and I call the court's attention to the case of Bates v. Bates. In that, we have a 15-year relationship. We have one of the parties renting a home to the other party for which that party pays. And even though they were photographed kissing and hugging, and it was apparently a romantic relationship, the Supreme Court said that does not constitute a conjugal relationship. And the reason it doesn't is because there is no indication that these two people have mingled their assets and have shown a permanency in the relationship. Well, isn't that what the trial court focused on in her order here, was the financial aspect, and she basically said the appellant here failed to prove any kind of commingling of assets or payment of bills together or anything like that. That is true, Your Honor. And I want to comment on... Is that dispositive under the case law? I think the way the Fifth District analyzes it, and I believe even the Miller case that just came down from the Second District that Mr. Wells is referring to, if that aspect doesn't exist in the relationship under banks, there can be no de facto marriage. Okay, now let me just ask you the reason I asked that question. Sure. Okay, so let's say in this case the proof all was that he did live there every night, that it was a sexual relationship, all those things, but there was no proof of any money exchanging hands, your argument would be... No de facto marriage. Petitioner failed to prove the case. Yes. The partnership and permanency are the two key aspects that the cases focus on, and I'm talking about the Supreme Court and I'm talking about all the cases that have come down recently. The Fifth District has consistently held that there has to be an analysis of whether the relationship extinguishes or diminishes the recipient spouse's need for maintenance. And if you apply that analysis in the case before you today, it is clear that because there's no mingling of financial assets, neither one of these two has ever had a bank account together, neither has ever shared property together. The most they do is carpool to Florida. Yes, it's a thousand miles, but people carpool all the time for economic reasons. Senior citizens in particular are very, very astute about maximizing what income they have. That is what's going on with these two, that they have never acted as man and wife by joining their assets, by joining their finances, or, you know, in indicating in any way a permanency. It's apparent that Mr. Norman would go off at times and leave Kathy. He'd go off to Florida and leave Kathy because he wanted his medical company. I'm sorry? Let me ask you about the carpooling. Wasn't the evidence that they only shared one car the entire six months in Florida? That's true. They did share one car, but they did not co-own that car, and I think that's where the line is drawn. This was Kathy's car. I'm assuming it was the more economical of the cars that the people had. They would travel down there together. They would share this one car together. I don't know. Maybe Kathy wouldn't feel comfortable driving all the way to Florida by herself. That was never pursued. But it was clearly established that that car belonged only to Kathy and that the two of them never mingled any assets. So, you know, it basically was a traveling situation and for convenience and perhaps for safety. I don't know. It wasn't explored. But when the factual statement is said to be the car is shared, it is meant only in terms of travel. It is not co-owned. Nothing by these two is co-owned. Kathy testified that she had no intention of committing to Don Norman. In fact, when she bought her trailer in Florida in 2009, she had no idea that Bill was going to eventually file a petition to terminate her maintenance. So this is not acting out or planning on her part. It is simply an end of day, you know, call it cocoon, call it what you will. These are elderly people who have some independence, their kids are grown, and they want to have some fun, golf, have companionship. Kathy made it clear she had female friends that she golfed with, that she went out to dinner with. She had other male friends that she golfed with, she went out to dinner with. She made it clear that she and Don at no time had any permanency in their minds. There was never a commitment. And that is required. There are two, actually three prongs to the de facto marriage. There must be commitment, there must be permanency, there must be partnership. That is stated in the Bates case, that is reiterated in the Second District case that just came down in 2015 that is referred to by Mr. Wells. We have none of that in this case. All Mr. Wells has told you about is a dating relationship and the Supreme Court and all of the opinions that have followed Bates indicate that we're not going to take away the recipient spouse's right to live a life, to date, to move on from a failed marriage. If the payer spouse is allowed to scrutinize every time someone goes to play golf, goes to a movie, has someone over for dinner, by goodness, that would open the gates of litigation and hardly anyone would be paying maintenance anymore. So I ask you to affirm the trial court's ruling. The trial judge was right on. She had to decide whether a de facto marriage was approved. Not only did the initial threshold go unproven, the threshold of cohabitation, whatever Mr. Nauman thought. There was no proof presented by Mr. Phillips that Mr. Nauman was living there. Where's John Nauman? Bring him in. Let him talk about why he put this address on public record other than to have his important notices go to Captain Small, while he was gone. Otherwise, there'd be no reason for them to go there. So, Your Honors, I'd ask that you affirm the ruling of the trial court if you assume the cohabitation threshold was met, the other prong is definitely not met. There is no proof of permanency, no proof of commitment, and no proof of partnership in terms of assets or income. And those are required because this district requires that there be a showing that the new relationship replaced supplants, the recipient spouse's need for the maintenance that was awarded to her. Thank you. Thank you, Ms. Phillips. Mr. Wells, Mr. Bartlett. Thank you. Bring him in. It's nice to say, but who's the one who has the greatest ability to bring Mr. Naiman in? Who's the one who has the greatest understanding of what Mr. Naiman has and says? Was his deposition taken? No, it was not taken. And did your side try to subpoena him or anything like that? No, we did not. So nobody really knows what he would have said. Well, at the time we were given information as to the address, which was in the fall of 2015, we subpoenaed the records from the city of Waterloo for his residing, because we were given an address. We found that he resided at this address for six months. It's very important to note that out of the over 60 to 72 months of the relationship, the only address that were provided from Mr. Naiman for any of that time is this six-month period of time. Also in those records, which are part of the appendix's brief, are the utility records of Mr. Naiman at this place. And it's the equivalent to the Heron case. He pays no utilities, but maybe a minimum payment of $20 a month. It sounds like she's supporting him. Your Honor, it's exactly right. Your Honor, I'm going to point out the fact that in my brief... How does that supplant the need then for no longer having the need for maintenance? Your Honor, first off, there are two things that are going on with that. The first is this. Under the Susan case, in the trial court's order, she says it's an important factor. If you look at the Miller case, the Miller case, it says it's not a factor with reference to whether or not this is to continue or not. But I point out in the reply brief on pages 15 and 16, we quantify the actual amount of money that Mr. Naiman is saving by this relationship with Kathy. Now, the fact is, my client should not be required to subsidize that relationship. Just as if you say there's some relevant factor to the need, there certainly should be no obligation for him to provide what's there. And what are the largest expenses? The largest expenses are housing, transportation, food, and utilities. Who's providing the utilities in this case? Where's the laundry being done? Where's the air conditioning on? Who's providing them? Kathy's providing them. If you look at what's going on in terms of transportation, six months of the year, Kathy's providing transportation with her car. Where's Mr. Naiman's car? It's in the garage at 805 Mahala Drive. It's not sitting on the street someplace. It's in the house that we're claiming he has some relationship with. Yet we have all those things going on. Another telling thing, Your Honor, is this. Counsel said the court found the explanation to be satisfactory. That's one of the reasons we're here, we don't believe the court had the right to say that that was satisfactory in light of and in face of the other contradictory documentary evidence and the fact that these other expenses are being paid. And there's other relationships there. Our standard of review is whether or not the trial court's findings as to the facts are against the manifest way to the evidence. Correct, Your Honor. But as far as the sterile record, as far as the law, it's a de novo review by this court that was determining whether it was properly applied. It's our position that it was improperly applied because one of the major factors there were the need, whether the relationship reduced the need. She was looking for that. That was something that isn't required to be shown. I gave you an imprecise quote from the Miller case, and I want to give you the exact language that appears on page 17. They talk about a shared day-to-day existence. We believe we've shown a shared day-to-day existence. Over 90% of the days they had meals together in Florida, the majority of the meals were held at Mahalo Drive. She bought groceries and cooked them at Mahalo Drive. The only male who ate in that other than her son or grandson was Namie for the entire period of time that we're talking about. We had the same situation down in Florida as far as what's going on. We had that three-month rental gap in which there is no explanation as to where she stayed for those other three months in Florida. Again, we have the obligation to go forward with proof. I also gave you an imprecise quote with reference to what she said concerning going back to Belvin. I want to give you a quote from the record. Again, I believe it's on page 198. I wanted to have other relationships to be back with my grandkids and to be back with Belvin. I wanted to be back home again. Now, if that's what she wanted to go back to, I don't think it's a quantum leap for this court to say what she went to when she went down to Waterloo to a residence that was found by Mr. Namie in a community that was known by Mr. Namie and then built up a relationship and went down to Florida and found a place. Thank you. Thank you, Mr. Weld. We'll take the matter under advice of the member, and we'll end with these quotes.